VISITORS M. E. CHURCH OF CAPE ISLAND and JOHN P. MC-GOVERN, complainants,

*v.*

WILLIAM C. TOWN et al., executors of Emily Corgie, deceased, defendants.

VISITORS M. E. CHURCH OF CAPE ISLAND and GEORGE W. AGNEW et al., complainants,

*v.*

WILLIAM C. TOWN et al., executors of Emily Corgie, deceased, defendants.

1. The benefits received in the way of religious instruction and consolation by one who attends regularly upon the ministrations of a religious society constitute a meritorious consideration for a conveyance of land by such attendant to the society which will induce a court of equity to supply a defect in the conveyance.

2. A deed of conveyance conveyed land to "A, B, C, D" and others, trustees of the Methodist church &c., and "their successors in office forever," without using the word "heirs."—*Held,* that the intention to convey a fee simple was manifest, although the absence of the word "heirs" prevented a court of law from giving effect to it.

3. The Methodist church named was a regularly incorporated religious society.—*Held,* that the conveyance enured to the benefit of the corporation.

4. The last survivor of the trustees named in the deed having died, and the heir at law of the grantor having recovered in ejectment the land conveyed—*Held,* that he should be perpetually enjoined from enforcing his judgment, although the conveyance was without other consideration than the attendance upon the ministrations of the church.

Two causes heard together, by consent, on bill, answer and proofs.

*Mr. William E. Potter*, for the complainants.

*Mr. Herbert W. Edmunds*, for the defendants.

Pitney, V. C.

These bills were filed to restrain the execution of two several judgments in ejectment, and to that end to reform two several deeds of conveyance executed by William Corgie, the ancestor of Emily Corgie, to the trustees of the corporation complainant.

The first of these deeds, which is dated May 21st, 1850, conveyed a lot of land, which was afterwards conveyed by the corporation by warranty deed to one Brooks, and afterwards became vested by mesne conveyance in the complainant McGovern. The other deed, dated April 29th, 1852, conveyed another lot, which was afterwards, in like manner, conveyed by the corporation to one Cake, and afterwards became vested in the complainants Agnew.

Two several actions of ejectment were, in 1888, commenced in the Cape May circuit court by the defendants to recover possession of these lots severally, one against McGovern and the other against the Agnews, and recovery was had in both cases. The corporation complainant being liable on its covenant of warranty to the defendants in ejectment, joined with them as complainants in these bills.

The case developed at the hearing was as follows: The corporation complainant is the successor, by a slightly changed name, of "The Trustees of the Methodist Episcopal Church of Cape Island," a religious corporation duly organized by that name in 1843. William Corgie was a resident of Cape Island and a zealous and active member of this church, and for many years, and up to the time of his death, was one of its board of trustees. He took great interest in its welfare, and was a liberal contributor to the expense of its maintenance. In 1850 an effort, which proved successful, was made to provide a parsonage for its pastor.

Mr. Corgie gave the site and contributed largely towards the expense of the building. The remainder of the funds was raised by voluntary subscriptions and contributions by other members of the church.

Among the entries on the minutes of the church relating to the building of this parsonage are the following:

"September 28, 1849: William Corgie agrees, provided funds can be raised for this purpose, to furnish a site of ground, sufficient size, and deed the same to the Methodist Episcopal Church, and by consent of all present their names is hereunto subscribed."

Here follow the names of nine persons, among them William Corgie, all in the handwriting of the secretary of the board of trustees.

And on October 18th, 1849, is this entry:

"On the 8th of October, 1849, the Committee, viz., Lemuel Shaw, David Pearson and Israel Hughes, as above, called a meeting at J. Miller's and made this their report: That a house thirty feet by eighteen, with a back leanto 8x12 feet, to cost $700, will be in their judgment a right sort of a house for a parsonage. Accordingly the meeting concurred in the same and adopted their report. * * * We, the subscribers, agree to pay the sum annexed to our names for the purpose of erecting a parsonage house on Cape Island for the Methodist Episcopal Church, believing the same will do much moral and religious good. Donations at once subscribed, viz.: *Wm. Corgie gives a lot or piece of ground to build on, and is to deed the same to the M. E. C.;* J. Miller, $50, pd.; Lemuel Shaw, $25, pd.; Israel Hughes, $25, pd.; David Pearson, $25, pd. in work; Jeremiah Church, $15, pd.; Masin Ware, $10, in work; Jerh. Edmunds, $10, pd.; total, $160, and the meeting adjourned."

Then, under the date of May 3d, 1850, is this entry:

"Parsonage house was erected on a lot of ground *presented to the church by brother William Corgie;* he not only gave that but paid one-third of the bills, so that the house and lot is free of incumbrance and belongs to the Methodist Episcopal Church on Cape Island."

It thus appears that contributions of money were made by other members of the congregation upon the promise of Corgie to give the lot.

The parsonage lot referred to in these minutes is that which was conveyed by Corgie by the deed of May 21st, 1850, and

afterwards conveyed to McGovern. It thus appears that the parsonage was erected before Mr. Corgie conveyed the site.

The language of the deed by which Mr. Corgie attempted to convey this lot gives rise to the controversy in the McGovern case. The parties of the second part are described in it as follows:

"Israel Townsend, Jonas Miller, Jeremiah Church, Israel Leaming and John Haney, Trustees of the 'Methodist Episcopal Church' on Cape Island, in the county and state aforesaid, and their successors in office."

And the grant is:

"Unto the said Israel Townsend, Jonas Miller, Jeremiah Church, Israel Leaming and John Haney, Trustees of the aforesaid 'Methodist Church on Cape Island,' and their successors in office."

And the *habendum* is:

"Unto the said Israel Townsend, Jonas Miller, Jeremiah Church, Israel Leaming and John Haney, Trustees of the said Methodist Episcopal Church on Cape Island, and their successors in office, to them and their only use, benefit and behoof forever."

And the covenant of warranty is in the same language.

The contention of the defendants in the law court was, and here is, that the conveyance was to the individual trustees and not to the corporation, and that the absence of the word "heirs" limited the estate, which passed, to one for the life of the last survivor of the individuals named as grantees. That event having happened, ejectment was brought by the defendants, which resulted in the judgment in their favor.

The complainants contend that the intention of Mr. Corgie was to convey a fee, and to convey it to the corporation. This, they say, is manifest, as well from the object of the grant and circumstances under which it was made, as from the language actually used—"their successors in office"—to which is added, in the *habendum*, "forever."

I think they are right in this contention. It seems to me that the intention is quite as clear as if the deed had contained the words, "it being the intention of the said Corgie to convey to

the said corporation an estate in fee simple in said premises." It is impossible to believe that either of the parties to the transaction supposed that only an estate for the life of the last survivor of the individual trustees passed. The language used is that prescribed by the printed book of discipline of the Methodist Episcopal Church then, and for a long time afterwards, if not still, in force in this state, and many, if not most, of the titles of its numerous churches in New Jersey are held under conveyances couched in the same or similar language, and lacking the word "heirs." If we assume that the parties to that deed supposed that only a life estate passed, we must assume the same in every instance where it has been used under similar circumstances—a result quite impossible.

In this connection it is to be observed, that if we strike from the deed the names of the individual trustees, the words remaining properly describe the corporation.

And thus the question to be determined is, whether (a court of law having determined that a fee did not pass for want of the word "heirs") this court can supply the defect, it being admitted that there was no valuable consideration. Here complainants contend—in addition to a consideration which applies to both cases, to be considered further on—that, in the McGovern case, William Corgie's heirs and devisees are estopped from saying, or setting up, that only a life estate passed, by the conduct of Mr. Corgie in inducing other members of the church to contribute money to build a house upon his land upon the promise to give it to the church as a part of his share or contribution to the cost of a parsonage; or, considering the expenditure as made by the church itself, in standing by and encouraging the church in expending moneys in building a dwelling on this lot, knowing, as he did, that it was done in the full belief that the church had, or was to have, a perfect title in fee simple. Here, again, I think that, upon the plainest principles of equity, the complainants are right, and must prevail in this court.

The Agnew lot stands in a somewhat different position. The deed of conveyance of this lot, made two years later, viz., in April, 1852, uses the same language as in the McGovern case, with two

or three changes in the names of the trustees, and is also wanting in a valuable consideration.    There is, however, no proof before the court as to the circumstances under which that lot was conveyed.    There is a gap in the minutes of the church from May, 1850, to January, 1853, covering the date of this deed, and no evidence was produced tending to show why, and under what circumstances, it was made, except that Mr. Corgie was all the while a member and trustee of the church, receiving the benefits of its teachings and influence.    The land conveyed by this deed was held by the church as a vacant lot—or rather, two vacant lots, lying together—without any improvement thereon, until it was sold, in 1864.    In the meantime the church had sold its old place of worship and bought another in a different part of the city, all with the knowledge and assent of Mr. Corgie, who was then a trustee.    In accomplishing this it had incurred a considerable debt, and these lots were offered for sale to raise money toward paying it.    The purchase of the new church was completed May 6th, 1854, and the minutes of May 8th, 1854, contain this entry : " Lemuel Shaw is to advertise and sell two lots [the Agnew lot] that William Corgie gave the church."    And, again, July 5th, 1856, in the minutes of a meeting of trustees attended by Mr. Corgie is this entry :

" It was further agreed that J. Miller to have an understanding with Mr. Thomas, auctioneer, in Philadelphia, to sell at public sale this month a lot or parcel of ground belonging to the church, providing it will sell for $1,000."

It was argued by the complainant that, by uniting in authorizing the sale of these lots, Mr. Corgie, in effect, authorized the church to convey a complete title and to make use of a conveyance containing the usual covenants of warranty, and that the church having done this, he and his heirs and assigns should be estopped from setting up that the church had not a fee simple to convey.    There would be great force in this position if it appeared that the conveyance was in fact made in pursuance of the resolution in question.    But eight years intervened before the sale, and I am not prepared to hold that the resolution referred to can reach so far.

Mr. Corgie died in October, 1856, testate of a will which made no mention of either of these lots, and whatever interest he had in them passed under a general devise of the residue.

But the complainants rest their case upon another and a broader ground. They admit the general rule to be, that equity will not lend its aid to cure a defect of the kind now being dealt with in the absence of an adequate consideration. *Meeks* v. *Kettlewell, 1 Hare 464; S. C., 1 Phil. 342; Edwards* v. *Jones, 1 Myl. & C. 226* (at *p. 237*); *Antrobus* v. *Smith, 12 Ves. 39; Woodruff* v. *Savings Institution, 7 Stew. Eq. 174; Wittingham* v. *Lighthipe, 1 Dick. Ch. Rep. 429.*

But they contend that this rule does not apply to cases where the conveyance is made in fulfillment of a moral obligation or duty, as in the case of a provision for a wife or a child, or of a gift to a charity. The argument is this: That one who enjoys the benefits of a religious society is under a moral obligation to aid in its support, and the measure of that obligation is his own conscience; and that whatever he himself deems to be a proper remuneration to the society should be deemed reasonable, and where he has attempted to make that remuneration, and has failed in some respect to carry out his intention, equity should lend its aid and cure any defect, under the same circumstances and in the same manner as it would aid a defective conveyance for a money consideration, or for the consideration of love and affection within the prescribed degree.

This position is not without authority.

In the case of *Attorney-General* v. *Tancred, 1 Eden 10, Amb. 354* and *1 W. Bl. 90*, Christopher Tancred conveyed land to feoffees to the use of the masters of Christ and Caius Colleges; the president of the College of Physicians; the treasurer of Lincoln's Inn; the master of the Charter House, and the governors of Chelsea and Greenwich Hospitals, and their successors, in trust to pay certain persons certain annuities for educational purposes. The lands were claimed by the several colleges mentioned, by the society of Lincoln's Inn, and of the Charter House and of Chelsea and Greenwich Hospitals, and the question was, whether, the conveyance being to the individual officers instead

of to the corporation, the defect could be cured by the court of chancery, and it was held that it could by Sir Robert Henley (afterwards Lord Northington), lord keeper of the great seal. The action in the court was taken ostensibly under the statute of *43 Eliz. c. 5*, being the act giving jurisdiction to the court of chancery over the administration of charitable uses; but I am unable to see, upon an examination of that statute, how it was any warrant for the action of the court in lending its aid to cure a defect in the conveyance of land. And in fact the report of the case in *Ambler*, and that in *Blackstone*, show that the only use made of the statute was to declare that the charities were good, while the decree of reformation was based upon the general equity of the case. In *Ambler* the lord keeper is reported as follows: "First, as to the deeds. Objection, that the estate is given to persons incapable of taking in succession. But the constant rule of the court has *always* been, where a person has a power to give, and makes a defective conveyance to *charitable uses*, to supply it as an appointment, as in *Jesus College (Collison's Case), Hob. 136*." And in *Blackstone* as follows: "The conveyance is admitted to be defective, the use being limited to certain officers of the corporation and not to the corporate body; and, therefore, there is a want of persons to take in perpetual succession. The only doubt is, whether the court shall supply this defect for the benefit of the charity under the statute of Elizabeth. And I take the uniform rule of this court *before*, at and after the statute of Elizabeth, to have been, that where the uses are charitable and the person has in himself full power to convey, the court will aid a defective conveyance to such uses." And see *1 Spenc. Eq. Jur. 591, note*, where the same view is taken of the reason of the lord keeper's decision.

It must be observed, however, of this case, that although at first glance it seems on all fours with that before the court, yet, upon close reading, it does not appear that in the feoffment to uses the word "heirs" was wanting. What the court actually did, was to substitute those several corporations as grantees instead of their officers.

In *Innès* v. *Sayer, 7 Hare 377* (at *p. 385*), a defective execu-

tion of a power in favor of a charity was remedied. The cause was fully argued, and (at *p. 387*) Vice-Chancellor Sir James Wigram uses this language : " It cannot be denied that there are express decisions of the highest authority, that the court will supply the want of a surrender of a copyhold *in favor of a charity*. The supplying the surrender of a copyhold, and the supplying the execution of a power which is defective in form, go hand in hand. It appears to me, that wherever you find a decision that the court will supply the surrender, it follows (unless this case be an exception), that the court will also supply the defective execution of a power. Such a case is, by analogy at least, a strong authority for the proposition contended for." And again (on *p. 388*): " The principle upon which the court appears to go is this, that if a person has power by his own act to give property, and has by some paper or instrument clearly shown that he intended to give it, although that paper, by reason of some informality, is ineffectual for the purpose, yet the party having the power of doing it by an effectual instrument, and having shown his intention to do it, the court will, *in the case of a charity*, by its decree, make the instrument effectual to do that which was intended to be done."

· This decree was affirmed by Lord Truro on appeal. *3 Macn. & G. 606* (at *p. 620*). It is remarkable that although a great number of cases were cited on the argument of this cause, *Attorney-General* v. *Tancred* is not among them.

Both of these cases, and most, if not all, of those cited in their support, were instances of gifts to charities, from which, so far as the case showed, the donor had received no benefit.

But here the gift was to a charity from which the donor had already received, and continued to receive during his lifetime, a personal benefit in religious instruction and consolation, besides the general benefit which he, in common with all the citizens and property-owners of the vicinity, derived from the improvement of the morals of the inhabitants and the general attractiveness of the city and its desirability as a residence, resulting from the maintenance of a social organization like that in question. These benefits, in my judgment, created a moral obligation on the part

of the recipient to make compensation, and so formed a *quasi* consideration for the gift, which did not appear in the cases above cited.   The argument from those cases to this is, for that reason, *a fortiori.*

Professor Pomeroy, discussing this subject, says (*2 Pom. Eq. Jur.* § *588*):

"All agreements, so far as the binding efficacy of their promises is concerned, must be referred to one or the other of three causes—a valuable consideration, a mere voluntary bounty, or the performance of a moral duty.   The first alone is binding at law, and enables the promisee to enforce the obligation against the promisor.   The second, while the promise is executory, is a mere nullity at law and in equity.   The third constitutes the *meritorious* or *imperfect* consideration of equity, and is recognized as effective by it within very narrow limits, although not at all by the law.   While this species of consideration does not render an agreement enforceable against the promisor himself, nor against any one in whose favor he has altered his original intention, yet if an intended gift based upon such meritorious consideration has been partially and *imperfectly* executed or carried into effect by the donor, and if his original intention remains unaltered at his death, then equity will, within certain narrow limits, enforce the promise thus imperfectly performed, as against a third person claiming merely by operation of law, who has no equally meritorious foundation for his claim.   The equity thus described as based upon a *meritorious* consideration only extends to cases involving the *duties* either of *charity,* of paying creditors, or of maintaining a wife and children."

It seems to me the case in hand stands well within the principle thus so cautiously stated.   The intention of the donor to make a complete gift is clear ; it was based on a meritorious consideration actually received by him in religious instruction and solace, and it remained unaltered at his death ; he did not revoke it by any act in his lifetime.   His will did not mention its subject.   And it is therefore enforceable against his heir at law or devisee under general residuary devise.

Professor Pomeroy, in *section 589*, proceeds to state that the remedial action of equity in favor of charities has been confined to the two cases of want of a surrender of a copyhold estate and defective execution of a power.   But I am unable to discover any distinction in principle between these two cases and that of supplying the omission of a word in an ordinary conveyance, which word, according to the strict rules of the law, is necessary to cre-

ate the estate which the donor intended to convey. The canon of the law, that an estate in fee shall not pass without the use of the word "heirs," is no more imperious or sacred than the command of a testator that his donee shall have power to grant a particular estate, provided he uses a certain formality—as in *Innes* v. *Sayer*, the signing and sealing a will in the presence of at least two witnesses—and not otherwise. In the one case equity declares that an estate in fee did pass without the use of the potent word "heirs," and in the other that it did pass without the use of the prescribed formality. In both cases the omitted instruments are mere means to attain a certain object, and equity says that if the intention to attain that object clearly appears from the evidence it shall prevail. And I may add, that it seems to me that if there is any difference between the two cases, it is in favor of that before the court, and that it requires less stretch of judicial power to supply the word "*heirs*" than to not only add a seal but to dispense with the formality of the presence of two witnesses.

In my judgment, the complainants are entitled to the relief asked for. I will advise decrees accordingly, with costs.